Our next case on the call the docket is agenda number eight case number one one five seven six seven in Ray Theodore George Karavidas. Counsel for the appellant. Good morning may it please the court counsel my name is Stephen split and I represent the administrator of the Attorney Registration and Disciplinary Commission in this proceeding. We ask this board today to reverse the report of the review board panel in this case and instead to affirm findings by the hearing board that respondent Theodore Karavidas breached his fiduciary duty as executor to his father's estate and converted almost four hundred and fifty thousand dollars from that estate. A quick factual recap respondents father died in February of 2000 on the day that he died he executed a will and a trust he named his son Ted the respondent as the executor of the will he named him the successor trustee of the trust. Now under the will respondent was supposed to deliver his father's personal property to his mother and then put the remainder of the estate in two trusts a family trust and then a marital trust for the support of his mother. Respondent took an oath to act as the executor of the estate in April of 2000 at that point the estate was opened. Beginning in August of 2000 respondents started taking funds from the estate. Between the beginning of August and the beginning of December of 2000 he took over a hundred and fifty thousand dollars from the estate. Now he started making repayments to the estate in February of 2000. Did the estate documents authorize the respondent to borrow from the estate? They did not and that's what the hearing board found and that's what we're and that's what part of our argument is today. The hearing board found and after studying the text of the will of the trust of the Illinois probate act listening to the testimony of Theodore Rhodes a long-standing trust and estates practitioner that the will did not give respondent any authority to make distributions. The hearing board also found that the respondent lacked the intent to deceive or to fraud the estate or its beneficiary. That's correct. When this court looked at that, which standard would we apply? When looking at the finding of the hearing board. That there was no intent to deceive or no dishonesty? Yes. Well that would generally be a manifest weight type of question but no one the hearing board made a finding that respondent did not act dishonestly and we did not challenge that finding on review and in fact we're not challenging it before this court. What the hearing board found was that respondent converted the funds and that respondent breached his fiduciary duty as executor of his father's estate. Those are the the issues that. Are you challenging the intent? No. No. There's no intent? No. I mean we charged respondent initially with having acted dishonestly. The evidence did not turn out to be dishonestly. We did not challenge that no finding before the review board. So what the what the hearing board recommended that respondent be sanctioned for was breach of fiduciary duty by virtue of self dealing with his father's estate assets and converting the $448,000 that he took from the estate. That's what the hearing board found that respondent was had been liable for. Now that. Yes. A more fundamental question though was he acting as attorney or executor and how do you draw the distinction? He was he was he was not acting as an attorney in this matter. He did not draft the trust. He did not represent the estate. He was appointed the executor or he agreed to act as executor of the estate and our contention was that thereby he owed a fiduciary duty to the estate. He was also appointed as successor trustee to the trust. If the trust would have been funded he would have. Well there is no attorney client relationship and that is that that's the gravamen of the review board's decision. According to the review board because respondent's actions did not arise out of an attorney client relationship then the administrator essentially had no business charging him with breach of fiduciary duty or conversion. The review board's take on what the disciplinary law in Illinois should be is that absent an attorney client relationship we shouldn't charge an attorney with conversion. We should not charge an attorney with breach of fiduciary duty. The administrator submits that that view of the law by the review board is incorrect under long standing disciplinary precedent. With regard first to the breach of fiduciary duty it's it's now the review board didn't say that respondent was not a fiduciary and in fact the review board really couldn't have said that because it's long standing law that an executor of an estate owes a fiduciary duty to the estate and to the beneficiaries of the estate. What the review board seemed to say was that if an attorney is functioning as a trustee of an estate or an executor of an estate he might have a fiduciary duty but if he breaches that fiduciary duty that's something for the civil courts and that's not something that the decision by the review board goes against long standing disciplinary precedent in two regards. First of all this court has disciplined attorneys for decades for violating fiduciary duties that have arisen outside of attorney client relationships. If we ever discipline an attorney administrator who's also the beneficiary for breach of a fiduciary duty. I'm sorry could you repeat that? If we ever discipline an attorney administrator who's also the beneficiary for breach of a fiduciary duty. I don't believe that's been the case with this court has disciplined attorneys who are acting as executors as trustees they were not beneficiaries. This court has disciplined attorneys who breached fiduciary duties as aldermen as trust officers at a bank as escrow agents but the fact of the matter is it shouldn't matter that Respondent was a beneficiary for a couple of reasons. First of all Respondent was not a beneficiary of the estate. What the will says and what the expert opinion was in this case was that the only beneficiary of the estate was Respondent's mother to whom the Respondent's father's personal effects were to be given. At that point the remainder of the estate was to be put into trusts and trusts were to be funded. So the expert testified and the hearing board found that Respondent was not a beneficiary of the estate but from which he could take funds. Now if you look at trust documents there's a couple problems for Respondent with that also. First of all the trust was never funded. Respondent just kept the estate open and he never he never funded the trust never created the trust accounts and so the hearing board found that therefore the trust, excuse me, documents were not at issue. You can't have distributions of trust assets without assets in the trust. Would your position be different in this case had the trust been funded? Well perhaps. It is accurate that Respondent was a beneficiary of the family trust. There was supposed to be a family trust funded first with $675,000 and then the remainder was supposed to go into a marital trust. Now if you look at the trust documents Respondent was authorized as trustee to make distributions to himself as a trust beneficiary. Respondent wants to paint his authority to make those distributions as almost unfettered. For example Respondent as I noted beginning in August of 2000 to the beginning of December of 2000 Respondent took $150,000 of estate assets. Now under the trust he could have made distributions to himself but he would have been limited. The trust said that he could take income from the family trust. He could invade the principle of the family trust for his health, education, or support if the distributions he was going to make to himself were consistent with his other resources. Also the trust documents stated that with regard to trust distributions the care of Respondent's mother was to be given primary concern. So it's the administrator's position that Respondent could not have just gone unfettered into the trust assets and paid himself all the money that he ended up taking from the estate. He would have been constricted. I'm sorry. Does the fact that this was an independent administration give the attorney any solace, any defense to what was done in this case? Well he wouldn't have to go to the court to make distributions. He would have to make an accounting to the court and to the beneficiaries when he closed the estate. But it's really something that's, I mean perhaps if it would not have been an independent administration and he would have had to have had these distributions checked by the court, I would imagine that this would not have gone on for five years and would not have totaled $450,000. So was the estate or the beneficiaries damaged in any way? What were the damages? Well the damages were less than concrete. The estate was repaid in October of 2005. And the administrator's position is that this is more of a risk of harm case than a harm case. Now this court said in Decipio that risk of harm is something that the court takes into consideration when determining what kind of sanction to put into place. And the thing that you should remember here is that when Respondent took these withdrawals from the estate that he characterized as loans, they were not documented in any sort of fashion. There were no promissory notes. There were no interest rates. There was no collateral. There were no repayment terms, repayment time. So the thing of it was that the estate was supposed to have X amount of dollars in it at any given time. I think you've said that he taught action for conversion was available. He taught action for conversion was available to the people who were supposed to benefit from this estate. That's true. And in fact, his sister, who was another beneficiary under the truck, she did not file a conversion action. She filed an action to have Mr. Karavetis removed as executor based on a number of things, including his loans from the estate. And she was successful in having him removed as executor. But as of the time of the disciplinary hearing, which was 2011, the estate had been open for 11 years and it had not been closed yet. Did an independent counsel prepare these documents for the father? Is that correct? That's true. And was this attorney operating under advice from some of those attorneys in this matter? Well, what the hearing board found, and that attorney, John Hayes, testified. And does it make any difference? Well, it might. I mean, certainly if Respondent would have approached Mr. Hayes, who had drafted the trust and who was representing him in the estate matter, and said to Mr. Hayes, this is what I want to do with the estate assets. Can I do this? And Mr. Hayes would have said, yes, of course you can do that. Then you'd have a much harder time blaming Respondent for what happened here. But what the hearing board found was two things on that point. First of all, that John Hayes wasn't aware of these transactions when they were made. Respondent was getting bank records from the two securities accounts and he was forwarding them to Mr. Hayes, but the bank records did not show who these withdrawals were going to. So Mr. Hayes testified and the hearing board found that when Respondent was making these withdrawals, Mr. Hayes was not aware of what he was specifically doing. And the hearing board also found that Respondent never went to Mr. Hayes and specifically asked him, I want to loan myself money so that I can keep my law firm afloat, and I want to use estate funds, and can I do that? Mr. Hayes testified that he didn't know that this was going on until 2006, when after Respondent's sister had moved to have Respondent step down as executor, they were preparing an accounting. It was at that point that Mr. Hayes said that I learned that a lot of these withdrawals from estate funds were going to Respondent to prop up his law firm or to fund his wife's IRA or to pay his income taxes and things like that. I have a question about the record and Mr. Hayes. I couldn't tell from the briefs. Did Mr. Hayes also testify or was there evidence that it was his advice that the trust not be funded until the estate closed? That's correct. That's my understanding also. And then also Mr. Rhodes, the expert, said that any distribution then before a trust was created was not authorized by the will. I don't know if he said that. What he said was that distributions that Respondent made, for example, to donate to his sister's IRA account were not appropriate distributions. I believe that at some point some of the money that Respondent was taking from the estate account was to help Marie's Pizza, which was an asset of the estate, which was not doing too well, and I think it's arguable that Respondent in his capacity as protecting the assets of the estate was probably all right in making sure that that asset was not just going to go into bankruptcy or deplete itself. But Mr. Hayes was receiving the bank accounts that showed a lot of money going out and a lot of money going in. He was, yes. And there were a lot of stocks in the securities accounts. He testified that even seeing those bank records, he did not make a connection that Respondent was taking out money for his own benefit. He didn't. And the hearing board found that he would have no reason to have made that conclusion. How is this conduct, the counsel's conduct, even if self-service, even if self-serving, prejudicial to the administration of justice? Well, I think the conduct that the hearing board looked at as being prejudicial to the administration of justice was once his sister filed the action to get him removed, that dragged on for a while. There was, it essentially caused kind of a long court proceeding. If Respondent would have been consistent with his fiduciary duties to the estate by not taking these withdrawals for himself, by even, you know, if he wanted to perhaps take a loan, approaching the other beneficiaries, looking for counsel as to whether that kind of thing was appropriate, rather than just doing it and then having a lawsuit filed, which he ended up losing. That's what I think the hearing board was looking at to say, this is the part of this scenario that was prejudicial to the administration of justice because it engendered a lawsuit between Respondent and. It's the same kind of things on any lawsuit, that people are filing lawsuits every day. And at the end of the day, you could say, well, they really shouldn't have done it. Well, that's accurate. But the way this court has defined what it means to be prejudicial to the administration of justice, it's when other misconduct somehow has an adverse effect on the judicial system. And the hearing board's finding in this case was that it was because Respondent had breached his fiduciary duty in connection with how he handled his father's estate that caused this lawsuit to be filed. So it's not every disciplinary case that has a count or a finding of conduct prejudicial to the administration of justice. Under this Court's decision in Verdoliac, that's how it's defined, and that's what the hearing board found in this case. Would we have to go back and look at the pleadings in that case, then, the lawsuit? If you're saying the lawsuit is the key to this case, the lawsuit that his sister filed, would we have to go back and look at the pleadings as to what she alleged to make that determination? As far as the 8.45, as far as the conduct prejudicial count, yes, you would have to. And what she alleged was that he was – I don't know if she alleged that he was defrauding the estate, but she alleged that he had taken almost a half a million dollars from the estate without notice to the estate, without authority to take those funds. So with regard to the review board panel's decision here, it's the administrator's position that the review board's decision ignores disciplinary law and attempts to restrict the administrator's ability to bring cases before this court in a way that would not be consistent with what this court has done historically. Now, if this court were to adopt the review board's decision and say that breach of fiduciary duty charges should only be brought when there's an attorney-client relationship, there are going to be certain types of cases that just fall outside those parameters. Now, the review board seemed to say, well, a dishonesty charge can take care of all those cases. But that's not entirely accurate. There are certainly a number of cases where an attorney is alleged to have breached a fiduciary duty outside of an attorney-client relationship and yet not acted dishonestly. So it's the administrator's position that if this court would like to continue to see the cases that it now sees, that the review board's decision should be rejected. There's a couple of cases right now in the pipeline. There's a case called McKenzie in which the attorney for a family was made the trust of a family trust. He was a beneficiary along with his brothers. He was given power to invest the trust assets. He told his brothers that he wanted to invest the assets in his own startup business, and the brothers said, well, that's fine. He did invest them, but he didn't – there was no documentation. He did not make an investment in the company and then get a share of the company for the trust. It was very loose. There was no documentation. What happened was he essentially lived off the trust assets for a year and a half while he tried to get the business going. He was unsuccessful. The trust lost all its assets. Now, he did not act dishonestly, and he did not have a fiduciary duty arising outside of an attorney-client relationship, or he did. It was outside. It was just he was trustee. He didn't – he wasn't representing the trust or anything. That would be a case that would fall outside of the parameters of the review board's decision. There's a couple of other cases like that. And, in fact, the review board panel, a different panel yesterday, set out a report in the McKenzie case. It was argued last month, and the review board came out with a report yesterday that said that the findings of conversion and breach of fiduciary duty that were made by the hearing board in that case were consistent with this court's precedent, but if this court were to uphold the Karavetis Review Board decision, then the review board would want to revisit the sanction decision because there was another charge in that case of conduct prejudicial because the respondent had engaged in some foot-dragging with litigation. I see my time is up. Thank you. Thank you. Counsel for the appellee. Good morning. May it please the court. Counsel. My name is Sam Kavathis, and I represent Theodore Karavetis. At this time, based upon what Mr. Counsel for the administrator has stated to you, I'd like to go over a couple of facts which I believe he's inaccurately stated to this court. Before you do, Mr. Kavathis. Yes, I am. Before you do, I just want to see what we agree upon here and what we disagree upon. As I understand this, Mr. Karavetis is adamant that his conduct at all times complied with the Probate Act and the terms of the will and the trust documents. Is that fair? That's fair. All right. The bulk, I think, of Mr. Splitt's argument and what goes on beyond this case is whether the review board was correct in indicating that for purposes of disciplinary proceedings, both breach of fiduciary duty and conversion require an attorney-client relationship. Does Mr. Karavetis agree with the review board on that, or is the focus going to be on whether or not he complied with the Probate Act? You see where I'm going. Mr. Kerr, our position is this, that the review board made two alternative decisions as to why they did it. One was what you stated, and the other they said alternatively, just given the facts of this case, Mr. Karavetis did not violate the rules. There was no, by clear and convincing evidence, that he committed conversion and breach of fiduciary duty. And I'm not here to come before this Court to talk about, like Mr. Splitt represents the administrator in all these other cases, I'm here just for Mr. Karavetis's case to talk about the facts of this case. And it's the Court's purview to make the decisions on how it affects other cases here. So that our position is that he didn't commit breach of fiduciary duty, he did not commit conversion based upon the facts of this case and the law. All right. And you're not, you're really not going to touch much upon the review board's other finding that there has to be an attorney-client relationship? I'm not going to get into that. That's the review board has been hearing many cases, and they've addressed that issue with this Court, and I'm not going to get into that. I'm here for Mr. Karavetis's. You see where it's important if we disagree on the bulk of your argument, right? Pardon me? You see where it's important if this Court would find, for example, that Mr. Karavetis is incorrect, that he did not comply with the Probate Act and with the trust documents and with the will, and we found against on that position and we disagreed with the review board that needed an attorney-client relationship, you see the importance of it. I do understand that, but the Court can accept either one of the review board's reasonings behind it and how it affects other cases or how it affects this case. Okay. All right. Thank you. Just back to the facts a little bit. Are you claiming that the trust was funded, or do you agree that the trust was not formally funded while your client was acting as the executor? What happened was when Mr. Karavetis prepared the will, and the will provided that personal property when he died goes to his wife and the other goes into the George Karavetis Trust, which was funded. There is a George Karavetis Trust in existence upon his death, so there is a trust. And then there's a provision that upon his death it would be split into a family and a marital trust, so there is a trust in existence, the George Karavetis Trust. And had he lived, he could have done whatever he wanted to from the George Karavetis Trust. And as I'm going to point out to you, if you look at the documents, Mr. Ted Karavetis is a successor trustee that could do everything his father could do, including loaning to himself. So you're saying, and clarify this for me, that in acting as a trustee, he was not acting as trustee of the family trust or of the marital trust. He was acting as trustee of the living trust that was in existence prior to the day he died. Correct. The George Karavetis Trust, because the family trust hadn't been funded yet, or the marital trust, and at some point in time, according to Mr. Hayes, before the estate was closed, they had to be funded. That's what Mr. Hayes' testimony is. Are the provisions, are the details of the Karavetis Trust, the living trust, part of the record? Yes, and I'm going to go over a couple of those provisions with you hopefully before I get done. I would like to clarify a couple of things. Counsel said that Mr. Hayes was not aware of the loans or any distribution to the sister, the mother, and Maurice. That's not accurate. And I would refer you to the hearing board, page 9, of their findings, and they heard the testimony of Mr. Hayes. And I quote on page 7 of the hearing board's findings. It says, Hayes was aware, responded, made payments totaling more than $120,000 from estate funds for the benefit of his mother, including payments of real estate taxes, health insurance, and purchase of an automobile, and payments of more than $20,000 for the benefit of his sister. And that's going to be important in my arguments later on, because Mr. Rhodes, their expert, said no distribution, including those to the mother and sister, were allowed until he funded the family trust. The point being is that Mr. Karavetis hired Mr. Hayes immediately to handle the estate. Mr. Hayes specifically said he was aware that these things were happening, including getting statements every month, watching the figures on it, that Mr. Karavetis was doing the things that Mr. Rhodes says he could not do. And Mr. Hayes never told Mr. Karavetis, hey, you can't give your mother a car, you can't give her that because the documents don't say that. That's implying to me that it's okay to do it by Mr. Hayes. Mr. Hayes disagrees with what Mr. Rhodes says, and I'll get to the documents. I'd like to get to that. But one other thing that was talked about, the sister didn't file an action against him. It was a probate action going on for a long time, and when Ted Karavetis wanted to sell the business, she disagreed. She hired an attorney, and they went in to get him excused as executor, and he agreed and stepped down. So there wasn't a lawsuit filed. It was just a dispute between him and his sister. Now, I would like the court to briefly review the documents that are contained in our brief, the will and the trust. Specifically, we start with the will. As counsel said, Paragraph 1 says it goes to the mother, personal, but Paragraph 2 says I give the remainder of my estate to the successor trustee of the George Karavetis Trust. So that trust was created, and that was in existence. I'd like to point out to Article 5 of the will, the will. Now, the will gives the executor the power to act without any authority of court, and it also says the will, and Ted Karavetis is the executor, to distribute my estate in undivided interests, meaning he could give what he wanted to each one of the beneficiaries, including the fact that he was a beneficiary, and even though he was the executor, Mr. Karavetis, Ted, was the executor, is a fiduciary, and even though he had an interest. So the will specifically gives him the power to act like his father did, and then if you go on, because now there's a trust in existence to the trust documents, and it's Paragraph, or Page 12, it's Article 9, Paragraph K, and it says, and I quote, it allows the trustee, and he is a trustee of his father's account, estate, excuse me, trust, to make loans to, in the languages, to the fiduciary, and even though he's a beneficiary, and even though he's the trustee as a fiduciary. So we disagree with Mr. Rhodes, and it's clear language that he could use the money from the trust, the George Karavetis Trust, to make loans to himself, even though he's the beneficiary and the trustee. And then the last paragraph that I'd like you to look at is Paragraph of the Trust, is 10.2, and it says, every successor trustee, and that's Ted Karavetis, he's a successor trustee, held the rights and powers, discretions, and duties given to and imposed upon the original trustee, meaning that George Karavetis had the right to do what he did with the trust. He could loan his son money. Ted is now the successor trustee. There's money in the George Karavetis Trust. It just was never transferred to the Family and Marital Trust. So it gives him the power to do that. The documents are clear, and your honors can read that document. And just to clarify again, there was executed a will and a trust. Correct. The will poured over into the trust. Correct. The trust was not funded prior to death. Correct. Okay, so all of the assets were in the estate. Correct. And he had control of those as the executor until such time as he funded the trust. Is it your position that because he could have funded at any time he had all the powers that the trust set out, or was it, as the administrator here argues, until the trust is funded he had none of those powers? The money was in the George Karavetis Trust. What wasn't funded, meaning he didn't transfer and open up a Family Trust and a Marital Trust. There was a George Karavetis Trust where money was in the George Karavetis Trust. The personal property went to his mother. The other went to the George Karavetis Trust, as it says in here. And that's where the money was. It had to be transferred to the Marital Trust and to the Family Trust. First the Family Trust was to be funded to 675, and then the remainder to the Marital Trust. But, again, just to clarify, I guess I'm not understanding. At the time of his death, the George Karavetis Trust was not funded prior to death, was it? Well, he did it the same day that he passed away, but technically speaking it would have been right away. Once he died, the money went as follows. One, personal property to his wife, and second, everything else then went to the George Karavetis Trust. So that's where it was. By operation of the will. Right, pursuant to the will. Mr. Kavathis, when Mr. Hayes was retained as the counsel to help on all this, was there any, in your discovery, putting this case together, was there a letter from Mr. Hayes? You know, I'm going to represent you and here's what you're supposed to do. Mr. Karavetis. What you do and don't do. I mean, it's typically what probate estate lawyers do. I came into this case two days before the hearing of the hearing board. But testimony of Mr. Rhodes and Ted Karavetis is he was never told or given any information that he was to fund the marital and family trust before he acted. So that's all I know. There's no letters in the evidence or anything that what he did or didn't tell him. Thank you. But it's true that Mr. Hayes did represent Mr. Karavetis at the estate. Yes, they paid him over $60,000 during the course of this estate and also. He was the attorney for the estate. Yeah, and he also drafted the documents for the will and the trust. But that's in the record. Yes. When Ted Karavetis, he did know that the estate was going to be, he was an independent administrator. He knew also that he was going to have to give accounting at the end of this case. All his transactions everyone agreed to were transparent. Nobody didn't know, not know, nobody said that he was hiding any of this stuff. Everything went through USB bank. All the statements showed the transactions were there. Nothing went into his personal accounts. Everything was open and that's why he found no dishonesty, no deceit, no misrepresentation. Let's talk about the conversion itself. That's one charge. It's our position that you can't be guilty of conversion of money that it's yours to use. He had 100% interest in the funds he was using. Typical cases they've said is where you get attorneys. I've seen the cases in Ray Rosen where the attorneys co-mingling or using the Iola cases of funds or where they're an executor or I mean where they're holding money in a special account for real estate and the lawyers are using the money for theirs in the attorney-client relationship. There's also some cases like the Wortman case where he was treasurer of a buyer's association. He was using the money. All those conversion cases and every case that they've cited in both their brief and reply are where attorneys were not entitled to the use of the money. Mr. Karavides was entitled to the use of the money. And if you look at the Thebus case, Thebus states that conversion is an unauthorized act which deprives a man of his property permanently or wrongful deprivation of one who has the right to immediate possession of the object. And in this case, Mr. Karavides would be depriving himself of his money and you can't have that in conversion. It doesn't follow logic. In addition, the administrator claims that he had no authority to use the funds and was guilty of conversion. That's what they're saying because he had no authority to use the funds. But Mr. Rhodes specifically says that had he funded the family trust, he had authority to make distributions in undivided accounts with no accounting. So when they say he didn't have the authority, Mr. Rhodes agrees he did have the authority to do that. He just didn't transfer the money from one part of the trust to a family trust. So the authority was there. So the nexus with Thebus isn't there in this case. And he even said Mr. Rhodes said he could distribute in unequal shares. He didn't have to distribute everything and not pay it back. That's what he said he would have had to do. He could have done. And as I said earlier, Mr. Rhodes said distributing to his sister and mother was not authorized either. So he said he wasn't able to do that. And as I pointed out earlier, that Mr. Hayes knew he was doing this. And he never said or there's no evidence that he said, hey, you can't do that. He was getting the statements. I mean, Mr. Karavetis was not a trust attorney. He wasn't an estate attorney. He hired somebody to do this, and that attorney knew what was going on, and we want to claim that Mr. Karavetis is guilty of conversion because he didn't have the authority when the estate attorney never told him that. I think Mr. Hayes in one of his statements says when they asked him was the family trust or the marital trust funded, I think it's page 9 in the hearing boards, he says that the family trust or both trusts had to be funded before the estate was closed. He never said he had to fund it immediately. There was never that question to him. We believe that the review board was correct and found no conversion. When you get the breach of fiduciary duty, they claim that the respondent was self-dealing, and the basis for their decision was that he converted funds. So if this court finds there's no conversion, then that too must fall. The very nature of Mr. Karavetis putting his son as the executor, trustee, and beneficiary, any time he distributed to himself is self-dealing. Any time he did that, you'd be saying it's conflict, self-dealing, we know that. So let's talk about the duties of a fiduciary. There's duties of loyalty, honesty, accountability, and to follow the intent of the person who had them, the testator's intent in this particular case. There's no issue of accounting. Mr. Rhodes, their expert, said he didn't have to account to anybody until the end of it unless someone requested, and there's no evidence that there was a request for that. So there's no issue of anybody's bringing up any issue of the accountability. Both the hearing board and review board found there was no dishonesty, so there's no breach of his fiduciary duty for the dishonesty. Did Ted Karavetis carry out the intentions of his father to make distributions for the health, support, and education of his wife, his sister, and himself? Let's review his conduct. He gave $120,000 to his mother, bought her a Mercedes. He gave $20,000 to his sister. He gave $339,000 to Marie's, where his sister was the manager getting the salary and her mother was the hostess, benefit to both of them, and none of that was paid back. What did he do for himself? He used at the most any time $152,000, which is less than one-third of the $675,000, to use in his business to practice of law to support his family. What did he do? And he paid it back so the estate could continue to use it. What did he do to breach his fiduciary duty? I suggest nothing that they can point to that he breached his fiduciary duty, under just a fiduciary duty. Let's talk about the Hales case, which I cited. The Hales case specifically talks about when there is a conflict of interest, and that's in this case, or an apparent conflict of interest. Typically, a fiduciary is entitled to the money, or fiduciary usually is just the fiduciary handling the estate and has no interest in it. But in the cases, in the Hales case, they talked about the case where there's a conflict, and they said that where a creator of the trust creates an undivided loyalty, or knowingly places the trustee in a position which might conflict with the interests of the beneficiaries, his conduct, unless the fiduciary acts in a dishonesty or bad faith, it is not a breach of fiduciary duty. And that's exactly what we have here. We have an individual who is in a conflict position. I see my time is up. Can I summarize a couple things, Your Honor? Please conclude. Okay. Based upon that, if you look at the Nagler case, it's in line with Mr. Karavides, and this court has stated that we're not here to punish an attorney. I think Mr. Karavides did what his father, carried out his father's duties, and we don't believe that there was a violation of any rules. And just his lack of knowledge of funding or transferring money from one trust to another, as the review board suggests, should not have been brought in the first place, and it's not a basis for an action by the administrator, and we'd ask this court to affirm the decision. Thank you. Thank you. A few points on rebuttal, if you would. The administrator disagrees that there was a funded trust in existence. Respondent testified at the hearing that he never funded the trusts. Mr. Rhodes understood that he never funded the trusts. What the trust document calls for is that upon Mr. Karavides' death, that the money was supposed to go into a family trust and a marital trust. Mr. Smith, you're saying that there was no George Karavides trust that Will poured over into? He created a trust when he signed the trust documents. What he directed his executor to do was, upon his death, which turned out to be the same day, the executor was supposed to fund two separate trusts. But I meant the George Karavides trust. You mean the money wasn't in there? That's correct. The money was in the estate. They were in two accounts that were looked at by everyone as being part of Mr. Karavides' estate, not part of a trust. So respondent admitted at the hearing that he never funded these trusts. And when he wants to quote to you from articles of the trust that supposedly give him the power to loan funds to himself, he's quoting from deep into the trust after it's already been assumed that there had been the marital and the family trust created. Mr. Rhodes testified, if you don't have assets in a trust, you can't do anything with assets in a trust. So the trust provisions are just irrelevant at this point. Respondent's position at the hearing was that he was a beneficiary of his father's estate and that he could do these things under the terms of the will. And even if he wasn't a beneficiary of the estate, then he was going to get this money as a beneficiary of the trust. And so they're really given that there's no harm, there should be no foul. This seems to be kind of a turnaround of position for a respondent before this court. The hearing board's findings, both with regard to breach of fiduciary and with regard to conversion, are consistent with the law that is currently in place in Illinois. Conversion has been defined by this court since the early 90s as the unauthorized use of property, the unauthorized taking of property either permanently or for an indefinite amount of time. The hearing board found in this case that a respondent did not have authority to take this money from the estate, either by the will, by the Illinois Probate Act, by the trust, even if the trust had been funded, that this was self-dealing on respondent's part. May I ask a question about the record here? Yes. Mr. Rhodes testified as an expert in wills and trusts. He did. And he gave his opinion as to how the will and the trust should function, right? Right. So is this a matter of factors or is this a matter of law? Are we to rely on his opinion or are we to make a determination ourselves based upon our view of the actual documents? Certainly this court is free to interpret the trust and will documents as it sees fit. That would be a de novo review. If this court would read the trust documents and the will documents as different from how the hearing board and Mr. Rhodes read them, then it is certainly free to do so. Our contention is that if respondent would have been serious about a differing interpretation of those documents, he would have brought someone to trial to testify that the documents should be interpreted differently, rather than just saying, well, I had this authority. And when respondent disclaimed any expertise in the area of trusts and estates. Now, I'd like to, in the remainder of my time, address the sanction, if I could. The hearing board or the review board in this case certainly was critical of the fact that the administrator was seeking a sanction against respondent for three reasons. First of all, this was a family kind of dispute. It was not an attorney-client kind of relationship. That respondent did not act dishonestly. And because respondent eventually paid the trust back of the funds that he took. And these are not unimportant factors. The administrator's contention is twofold. First of all, that these things matter, but they matter to the sanction. They don't matter to whether there was a breach of fiduciary duty in the first instance or whether there was conversion of these funds in the first instance. And the administrator submits that these are important mitigating factors. But the administrator's contention is if respondent would have done this within an attorney-client relationship, if he would have acted dishonestly and if he would not have repaid the trust funds of the $450,000, this would be a disbarment case. If you look at the precedent that the hearing board cited, there are two cases that are substantially on point here, the Bower case and the Karate case. The Bower case was an individual whose brother set up a trust for the brother's children, funded it with $1.2 million, made the respondent the trustee. He gave the respondent the ability to take a loan from the trust, and the respondent took a $100,000 loan. He then defaulted, and he didn't pay it back. And then while his brother wasn't paying attention, the respondent took $197,000. Now, Mr. Bower did not act dishonestly. He made arrangements to repay the trust. He came forward with evidence of good character and community service, and he was suspended for nine months. Now, the administrator submits that this case is pretty close to Bower, but what you have in this case is a much more significant amount of money that would move the sanction up from nine months to something more. You have the Karate case. That was a situation in which a lawyer did create a trust, so it was within an attorney-client relationship. He was named trustee of the trust. He loaned $50,000 of trust funds to various people. $19,000 of the money was paid back. Thirty-one was not. Mr. Karate also avoided speaking to the beneficiaries of the trust for a period of time when they were trying to call him and find out what was going on. Mr. Karate was suspended for five months for essentially a $30,000 loss. He repaid that funds. He repaid with interest. He gave the beneficiaries back attorney fees. He offered evidence of good character. He had not been previously disciplined, and at the time he was caring for four children while his wife was fighting a terminal disease. This was serious mitigation in the Karate case. He was suspended for five months. So even if one looks at this case and looks at the fact that there's no dishonesty, replenishment, and no attorney-client relationship, you might think to yourself, well, a year seems kind of harsh. But you look at Bauer, you look at Karate, those attorneys were given pretty substantial suspensions in very similar types of situations. So what the administrator asks this court to do is to reject the review board's new definition of conversion and its new definition of breach of fiduciary duty as being unwise, as being something that would put beyond this court or put beyond the administrator the ability to bring certain actions to the attention of this court to affirm those findings of conversion and breach of fiduciary duty and under cases like Bauer and Karate to suspend respondents for one year. Thank you. Thank you. Case number 115-767, Enri Theodore George Karavides, is taken under advisement as agenda number eight. Mr. Split, Mr. Kavathis, we thank you for your arguments today. Mr. Marshall, the Illinois Supreme Court stands adjourned until Wednesday, May 22, 2013, 9 a.m.